Pridgen v. Carlson, 2025 NCBC 36.

STATE OF NORTH CAROLINA

WAKE COUNTY

TAMI L. PRIDGEN,

     Plaintiff,

v.

ROY NEIL CARLSON; CARLSON
FINANCIAL SERVICES, LLC;
G.A. REPPLE & COMPANY; THE
INSTITUTE FOR WEALTH
MANAGEMENT, LLC;
INSTITUTE FOR WEALTH
ADVISORS, INC. f/k/a CHERRY
INVESTMENT ADVISERS, LTD.,

     Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV012229-910

**ORDER AND OPINION ON
DEFENDANTS ROY NEIL CARLSON
AND CARLSON FINANCIAL
SERVICES, LLC'S MOTION TO
DISMISS AND DEFENDANT G.A.
REPPLE & COMPANY'S MOTION TO
DISMISS IN LIEU OF ANSWER**

1.    **THIS MATTER** is before the Court on the 4 October 2024 filing of Defendants Roy Neil Carlson (Mr. Carlson) and Carlson Financial Services, LLC's (Carlson Financial) (collectively, the Carlson Defendants) Motion to Dismiss (the Carlson Motion), (ECF No. 9 [Carlson Mot.]), and the 25 February 2025 filing of Defendant G.A. Repple & Company's (Repple) Motion to Dismiss (the Repple Motion), (ECF No. 12 [Repple Mot.]), (collectively, the Motions).

2.    Pursuant to Rules 12(b)(1) and (b)(6) of the North Carolina Rules of Civil Procedure (the Rule(s)), the Carlson Defendants seek to dismiss all claims alleged against them by Plaintiff Tami L. Pridgen (Ms. Pridgen). (Carlson Mot. 1.) Pursuant to Rule 12(b)(6), Repple seeks to dismiss all claims alleged against it by Ms. Pridgen. (Repple Mot. 1.)

3. For the reasons set forth herein, the Court **GRANTS** in part and **DENIES** in part the Motions.

*Mauney PLLC, by Gary V. Mauney, for Plaintiff Tami L. Pridgen.*

*Michael Best & Friedrich LLP, by Justin G. May and Joseph Lucas Taylor, for Defendants Roy Neil Carlson and Carlson Financial Services, LLC.*

*Hall Booth Smith, P.C., by Clark W. Goodman and Charles Jake Taylor, for Defendant G.A. Repple & Company.*

Robinson, Chief Judge.

## I.    INTRODUCTION

4. This action arises out of Ms. Pridgen's contention that Mr. Carlson, her investment advisor, made fraudulent statements to induce her to enter an investment advisor relationship with him. Ms. Pridgen also alleges that Mr. Carlson made fraudulent statements throughout their relationship regarding his status as a registered investment advisor and was not forthcoming when Ms. Pridgen inquired about the state of her investments. Ms. Pridgen alleges that Repple and Carlson Financial agreed to manage her investment profiles through Mr. Carlson, thereby also becoming responsible for Mr. Carlson's fraudulent acts.

## II.    FACTUAL BACKGROUND

5. The Court does not make findings of fact on the Motions. Rather, the Court recites the allegations asserted in the Complaint that are relevant to the Court's determination of the Motions.

## A. **The Parties**

6.    Ms. Pridgen is an individual resident of Nash County, North Carolina. (Compl. ¶ 229, ECF No. 2 [Compl.].)  Ms. Pridgen has little to no financial expertise and relied on her husband to make the primary financial decisions for her and her family.  (Compl. ¶¶ 2–3.)

7.    Mr. Carlson is an individual resident of Wake County, North Carolina. (Compl. ¶ 230.)  Mr. Carlson is the owner of Carlson Financial and has been a registered investment advisor since at least 2004.  (Compl. ¶ 8.)

8.    Carlson Financial is a registered investment advisor firm located in Raleigh, North Carolina.  (Compl. ¶ 231.)

9.    Repple is a North Carolina corporation with offices located in Raleigh. (Compl. ¶ 232.)  Mr. Carlson and Carlson Financial were agents of Repple until June 2013.  (Compl. ¶¶ 225, 232.)

10.    In July of 2007, Ms. Pridgen's husband died—leaving her approximately $1.2 million in life insurance policy proceeds and $1.3 million from his 401(k) and retirement plan.  (Compl. ¶ 1.)  Soon thereafter, Ms. Pridgen began looking for a financial advisor.  (Compl. ¶ 5.)  In or around October 2007, one of Ms. Pridgen's friends recommended she reach out to Thomas H. Smith (Mr. Smith), a registered financial advisor that went to the same church.  (Compl. ¶ 6.)

11.    During their initial meeting, Mr. Smith explained to Ms. Pridgen that since he was new to investment advising, he was currently being trained by Mr. Carlson. (Compl. ¶ 6.)   Thus, he stated, if Mr. Smith and Ms. Pridgen established an

investment relationship, Mr. Carlson would be making the major decisions and acting as her registered investment advisor. (Compl. ¶ 7.) In October 2007, Ms. Pridgen attended a series of meetings with Mr. Carlson and Mr. Smith in which Mr. Carlson explained the benefits of his investment advisor services. (Compl. ¶ 10.)

**B.** **Ms. Pridgen's Engagement of Mr. Carlson and Carlson Financial**

12. During the October 2007 meetings, Mr. Carlson made the following representations:

a. Mr. Carlson and Carlson Financial were formally associated with Repple as federally and state registered investment advisor representatives (RIA). (Compl. ¶ 9.)

b. Repple would be acting as an auditor or supervisor of Mr. Carlson's work, ensuring the quality, transparency, and professionalism of any investments made. (Compl. ¶ 11.)

c. Mr. Carlson, Carlson Financial, and Mr. Smith would be acting and operating at all times as Ms. Pridgen's fiduciaries. (Compl. ¶ 12.)

d. Mr. Carlson, Mr. Smith, and Carlson Financial would always put Ms. Pridgen's interests first and would act with transparency with respect to her investments. (Compl. ¶ 12.)

e. Mr. Carlson, Mr. Smith, and Carlson Financial would operate as Ms. Pridgen's RIAs pursuant to the federal or state RIA registrations maintained by Repple. (Compl. ¶ 12.)

f. Mr. Carlson had considerable experience and education giving him the requisite skills and qualifications to help Ms. Pridgen manage her money. (Compl. ¶ 13.)

13. Mr. Carlson further represented that his investment philosophy was "Christ-centered" and "faith-based," meaning that the investments would be aligned with Ms. Pridgen's faith. (Compl. ¶ 15.) This representation appealed to Ms. Pridgen as she is a devout Christian who was looking for advice from someone that shared her religious beliefs. (Compl. ¶ 4.)

14. During the October 2007 meetings, Mr. Carlson provided Ms. Pridgen with an SEC Form ADV advising Ms. Pridgen that the "Advisers Act imposes a fiduciary duty on investment advisers," and thus Mr. Carlson, Mr. Smith, Carlson Financial, and Repple would operate at all times as her fiduciaries. (Compl. ¶ 22.) Ms. Pridgen reasonably relied on these assurances and believed that Mr. Carlson, Carlson Financial, and Repple would act in her best interests. (Compl. ¶ 24.)

15. On 1 November 2007, based on Mr. Carlson's representations, Ms. Pridgen engaged Mr. Carlson and Carlson Financial as her RIAs. (Compl. ¶ 25.) Through the engagement agreement, Mr. Carlson and Carlson Financial assumed total discretionary control over Ms. Pridgen's investment portfolio. (Compl. ¶ 53.)

16. Mr. Carlson further promised that Ms. Pridgen's money would be invested in conservative investments as she had minimal outside work history. (Compl. ¶ 55.) Prior to Ms. Pridgen's engagement of Mr. Carlson, Mr. Carlson presented Ms. Pridgen with a set of portfolio recommendations. He stated that by investing in "Land

Banking" investments, "Church Bonds," and "Corporate & Municipal Bonds," she could expect to yield about $78,500 per year, which would be enough for her and her family to live on. (Compl. ¶ 57.)

17. Ms. Pridgen received monthly investment statements that seemed consistent with these representations. (Compl. ¶ 59.)

### C. Ms. Pridgen's Investments

18. Mr. Carlson invested Ms. Pridgen's funds in an array of private investments, which included "fixed income corporate bonds" or "church bonds" as well as commercial real estate ventures. (Compl. ¶¶ 64, 66.) Virtually none of these private investments underwent regular financial statement audits to determine whether they were compliant with Generally Accepted Accounting Principles (GAAP). (Compl. ¶ 68.)

19. Mr. Carlson kept many of the private investments at or above their costs on Ms. Pridgen's monthly statements and reported to Ms. Pridgen that the investments were yielding the expected returns. (Compl. ¶ 73.) Mr. Carlson was responsible for performing the due diligence on these investments and took a substantial fee from Ms. Pridgen's funds to do just that. (Compl. ¶¶ 70–71.)

20. However, Ms. Pridgen alleges that Mr. Carlson was cashing out her assets and falsely representing that her investments were generating enough money to live on. (Compl. ¶ 74.)

21. The private investments were not subject to internal control audits, and no reasonably current appraisals were conducted. (Compl. ¶ 75.) Mr. Carlson would

place artificial and inflated rates on these private investments, failing to keep track of the accurate values. (Compl. ¶ 81.) Some of the investments were even recorded as "unavailable," a term which Mr. Carlson represented meant only that the investment was difficult to value which was normal for private investments. (Compl. ¶¶ 82, 103.) He stated "[t]hat does not mean they are without value[,] it means that the value cannot be calculated now[.]" (Compl. ¶ 119.)

22. When Ms. Pridgen asked about the status of her investments, Mr. Carlson stated that they remained valuable and that everything was fine. (Compl. ¶¶ 90, 143.) When some of the companies Mr. Carlson invested Ms. Pridgen's funds in went into bankruptcy, Mr. Carlson represented that these events made her investments more valuable because the underlying real estate would be repurposed. (Compl. ¶ 94.) Ms. Pridgen was unable to ascertain the true value of her investments as they were not listed on a public exchange. (Compl. ¶ 96.)

23. Through June 2013, Ms. Pridgen received monthly statements from Repple that were sent out with Mr. Carlson's authority. (Compl. ¶ 98.) Repple and Mr. Carlson assessed RIA fees of up to 2.15% from the reported market values on these statements. (Compl. ¶ 100.) Mr. Carlson continued to operate as an RIA through Repple until June 2013. (Compl. ¶ 225.)

24. Following Mr. Carlson's departure from Repple, Ms. Pridgen's Repple account became a "house" account, meaning no advisor was assigned to the account and no advisory or investment fees were charged to Ms. Pridgen. (Aff. Glenn A. Repple ¶¶ 4–5, ECF No. 41 [Repple Aff.].) A $35 annual fee was taken from each

investment in the Repple account through its closing in 2021. This annual fee was paid to National Financial Services (NFS), the custodian of Ms. Pridgen's Repple account. (Repple Aff. ¶ 4.)

### 1. DBSI Investments

25. Mr. Carlson made investments on Ms. Pridgen's behalf in "DBSI Cavanaugh IV" (DBSI), which was a group of tenant-in-common investments with value derived from underlying real estate holdings. (Compl. ¶ 105.) Over the course of Mr. Carlson and Ms. Pridgen's relationship, Mr. Carlson purchased 150,000 shares of DBSI for Ms. Pridgen. (Compl. ¶ 105.)

26. Ms. Pridgen's monthly statements reported the DBSI investments had value, but the company had actually been maintaining little to no corporate formalities since its creation. (Compl. ¶ 106.) DBSI was being fully supported by investments and was only able to operate by the cash flow from new investors. (Compl. ¶¶ 107, 130.)

27. DBSI has never produced audited financial statements prepared according to GAAP, a fact which Mr. Carlson was obligated to investigate. (Compl. ¶¶ 108–09.) Nonetheless, Mr. Carlson and Repple reported to Ms. Pridgen each month a stated value for these investments. (Compl. ¶ 106.) Without corporate formalities, GAAP financials, or additional investigation by Mr. Carlson, there was no factual basis for Mr. Carlson and Repple's valuation. (Compl. ¶¶ 106, 108–09.)

28. However, DBSI was marking up the values of its real estate holdings by approximately 20% and then using that mark-up to pay sales commissions to anyone

bringing in investors, which included Mr. Carlson and Repple. (Compl. ¶ 110.) This commission structure was not disclosed to Ms. Pridgen. (Compl. ¶ 111.) Additionally, this commission far exceeded the fixed 2.15% of Ms. Pridgen's managed assets that Mr. Carlson and Repple were supposed to receive. (Compl. ¶ 111.)

29. By the end of 2008, DBSI was bankrupt. A bankruptcy investigator found that DBSI never "had any reasonable likelihood of generating income sufficient to ever repay" its obligations. (Compl. ¶ 112.)

30. On 17 November 2009, Glenn A. Repple (Mr. Repple), Repple's president, informed Ms. Pridgen in a written letter of DBSI's bankruptcy. Mr. Repple told Ms. Pridgen that any "anger" or "blame" could not be directed toward Repple or the RIAs because they "have not . . . breached [their] trust with you." Mr. Repple also stated that Repple and its RIAs were "dedicating time and resources to assisting and representing [their] investors in the DBSI recovery efforts." Ms. Pridgen believed what she was being told. (Compl. ¶¶ 116–17.)

31. Further, when Ms. Pridgen asked Mr. Carlson about the bankruptcy, he stated it would make the investments worth even more as it removed DBSI's management fees and increased the amount of income flowing from the investment. (Compl. ¶¶ 124, 135.)

32. Even after the bankruptcy and the subsequent November 2009 letter from Mr. Repple, Mr. Carlson and Repple continued to include DBSI on Ms. Pridgen's monthly account statements and described the market value of the investment as "unavailable." (Compl. ¶ 118.) Mr. Carlson also told Ms. Pridgen there "was no need

for any concern" because the investment was "[Securities Investor Protection Corporation] SIPC insured." (Compl. ¶ 120.) In reality, the DBSI investments and other investments on Ms. Pridgen's portfolio were not insured. (Compl. ¶¶ 121, 261.)

33. Mr. Carlson continued to provide statements to Ms. Pridgen reflecting minimal or no loss on the DBSI investments. Specifically, on 8 January 2013, Mr. Carlson sent Ms. Pridgen a statement representing that one of her DBSI investments, "DBSI Hernando South II LLC," remained at the full value of $600,000. (Compl. ¶¶ 123, 128.)

34. During this time, the DBSI investments paid Mr. Carlson through commissions and other compensation. Because of this, Mr. Carlson also inflated the managed assets fee he charged Ms. Pridgen while he assured her that the investment was secure, valuable, and appropriate. (Compl. ¶ 133.)

35. Mr. Carlson never disclosed that the DBSI investments were without material value, that the bankruptcy investigator discovered fraud at DBSI, or that Mr. Carlson had taken no actions to mitigate any investment losses. (Compl. ¶ 136.)

### 2. CNL Lifestyle Properties Investment

36. Another investment made on Ms. Pridgen's behalf was in "CNL Lifestyle Properties Inc." (CNL). When the CNL investment appeared to go down in value on Ms. Pridgen's monthly statements, Mr. Carlson told Ms. Pridgen this was a product of CNL being a "[real estate investment trust] REIT [that] has stopped raising assets" and needed to have an evaluation done by an independent accounting firm. (Compl. ¶ 137.)

37. Mr. Carlson told Ms. Pridgen this was "encour[aging]" and that CNL was taking steps to "ensure maximum value when [the] asset is sold or goes public." (Compl. ¶ 138.) However, CNL was actually in severe financial condition because of its concentration of speculative and illiquid real estate. (Compl. ¶ 139.) In 2014, CNL published financial information, which was available to Mr. Carlson, that indicated the values assigned by Mr. Carlson and Repple were false and unreliable. (Compl. ¶ 141.)

38. On 25 April 2016, Mr. Carlson informed Ms. Pridgen that CNL had "become a burden to manage" but that he was working to get things "straighten[ed] out both [as to] the custodial issues and reporting moving forward." He stated that he "would keep [Ms. Pridgen] posted" as to his progress. (Compl. ¶ 140.)

39. Sometime in 2016, CNL's auditors determined that the company's prior financial statements, specifically for 2015, had been misstated and needed to be revised. By 2017, CNL's Board of Directors adopted a plan of dissolution due to the company's desperate financial condition. Mr. Carlson did not disclose this information to Ms. Pridgen. (Compl. ¶ 141.)

### 3. The Madison Park Investment

40. Another investment made by Mr. Carlson on Ms. Pridgen's behalf was an investment in Madison Park Church of God (Madison Park). The Madison Park investment represented real estate in a down real estate market. (Compl. ¶ 142.)

41. When Ms. Pridgen asked Mr. Carlson about the status of her Madison Park investment, Mr. Carlson stated that the investment was "doing just fine," that the

investment was increasingly valuable, and that Madison Park was "current on [all] interest payments" even though Ms. Pridgen's account statements showed the market value as "unavailable." (Compl. ¶ 143.) Mr. Carlson's answers made Ms. Pridgen believe she was incapable of understanding the information he was providing, and she felt intimidated. (Compl. ¶ 144.)

42. On 7 July 2013, Madison Park declared Chapter 11 bankruptcy. Ms. Pridgen was unaware of this development. On her last account statement that included Madison Park, dated December 2012, Mr. Carlson reported that the value of her 7.9% Madison Park bonds was designated as "unavailable." (Compl. ¶ 149.)

43. In mid-2013, once Mr. Carlson changed RIA firms to the Institute for Wealth Advisors, Inc. (IWAI), Mr. Carlson changed the name of Madison Park on Ms. Pridgen's account statements to Kingdom Trust. Even though Madison Park filed for bankruptcy, Ms. Pridgen's account statements showed her investment in the Kingdom Trust at nearly full value through at least 31 January 2018. (Compl. ¶¶ 149–50.)

### 4. Worldview Community Church Bonds

44. On 8 January 2013, Mr. Carlson provided Ms. Pridgen with a document entitled "Combined Account Portfolio" that reflected two Worldview Community Church Bonds bearing interest at 7.5% and valued at $49,893.75 and $53,589.58. (Compl. ¶ 151.)

45.     Through at least December 2015, Mr. Carlson sent Kingdom Trust statements representing that the Worldview bonds were worth $48,600 and $52,200. (Compl. ¶ 151.)

46.     However, Worldview had been in financial distress and had not made an interest payment since at least 31 March 2011.  This was never disclosed to Ms. Pridgen, even though she was told that the bonds were maintaining their value and were solid investments.  (Compl. ¶ 152.)

### 5.     The Lifepoint Investments

47.     On 8 January 2013, Mr. Carlson provided Ms. Pridgen with a chart which listed as investments in her account three bonds issued by Lifepoint Community Church (Lifepoint Community Bonds) and Lifepoint Village–Southhaven (together with the Lifepoint Community Bonds, the Lifepoint bonds) valued at $74,905.33, $38,252.86, and $22,606.25.  (Compl. ¶ 153.)

48.     Mr. Carlson claimed that the year-over-year percentage change in value of the Lifepoint bonds was 1.6%, 1.87%, and 2.3% and sent Ms. Pridgen statements with this same information.  (Compl. ¶ 153.)

49.     However, the Lifepoint Community Church filed for Chapter 11 bankruptcy on 18 May 2012 and sent a letter on 21 May 2012 announcing plans to liquidate the real estate of Lifepoint Village–Southhaven.  Instead of disclosing this information to Ms. Pridgen, Mr. Carlson continued to include the Lifepoint bonds on Ms. Pridgen's monthly account statements.  (Compl. ¶¶ 155–56.)  As recently as 31 March 2020, the

account statements represented that the Lifepoint Community Bonds had increased in value to $77,376 and $39,675.70.[1]  (Compl. ¶ 154.)

50.  Mr. Carlson continued to represent to Ms. Pridgen that the Lifepoint bonds had not materially decreased in value, that the bonds were sound investments, and that they would continue to provide suitable income.  (Compl. ¶ 156.)

### 6.  Capstone Church Bonds Investments

51.  Starting on or about 4 December 2007, Mr. Carlson invested Ms. Pridgen's funds in the Capstone Church Bond Fund (Capstone).  (Compl. ¶ 157.)  Capstone was primarily invested in church-related obligations with church-related real estate holdings as collateral.  (Compl. ¶ 159.)

52.  Capstone did not have an established secondary market, meaning there could not be a represented market value on her statements.  (Compl. ¶¶ 158–59.)  However, a market value was provided on Ms. Pridgen's monthly statements.  (Compl. ¶ 159.)

53.  On 28 February 2007, Capstone's auditor discovered irregularities in Capstone's internal controls that prevented Capstone from being qualified as a regulated investment company for federal income tax purposes.  (Compl. ¶¶ 160–61.)  These findings caused Capstone to part ways with its auditor.  (Compl. ¶ 160.)

54.  Capstone Asset Planning Company (Capstone Asset) was the principal underwriter and distributor of shares in the Capstone fund.  (Compl. ¶ 163.)  On

---

[1] While the Complaint alleges in paragraph 153 that Ms. Pridgen purchased three Lifepoint bonds (*see* Compl. ¶ 153), the next paragraph of the Complaint alleges that two of the bonds had increased in value.

approximately 19 October 2013, Capstone Asset was sanctioned by the United States Financial Regulatory Authority (FINRA) for publishing misleading statements about Capstone's performance and making false claims between January and May 2009 that Capstone's church bonds were analogous to corporate bonds. (Compl. ¶¶ 162–63.)

55. However, despite Capstone's financial situation, on Ms. Pridgen's October 2013 statement, Mr. Carlson represented that her Capstone investments remained at the following values: $12,673.18 as of 2012 and $12,658.17 as of 2013. (Compl. ¶ 165.) Mr. Carlson continued to assess his RIA management fee based on the inflated values shown on the statements. (Compl. ¶ 166.)

56. As of 31 March 2019, Capstone, now called the Church Capital Fund, reported to the SEC a $6,551,198 capital loss carrying forward. (Compl. ¶ 167.)

**D.   Mr. Carlson's SEC Registration**

57. During Mr. Carlson and Ms. Pridgen's relationship, Mr. Carlson changed RIA firms and had complications with renewing his investment advisor registration. From 1 November 2007 through 21 June 2013, Mr. Carlson's SEC filings represented that his investment advisor registration was through Repple. (Compl. ¶ 36.) Starting on 2 July 2013 through 30 April 2019, Mr. Carlson's registration was reportedly through IWAI. (Compl. ¶ 37.) Mr. Carlson informed Ms. Pridgen of this change but stated that nothing would change about his professional obligations towards her. (Compl. ¶ 147.)

58. On or about 30 April 2019, Mr. Carlson's existing registration with IWAI was terminated because IWAI was forced to withdraw its registration with the SEC. (Compl. ¶ 177.) On 10 May 2019, Mr. Carlson filed a new investment advisor representative registration application in North Carolina, claiming an association with IWAI's affiliate, the Institute for Wealth Management, LLC (the Institute). (Compl. ¶ 38.)

59. Each application for renewal triggers an automatic review by the SEC. (Compl. ¶ 39.) This review revealed that Mr. Carlson's application had omitted numerous facts, including (1) his correct and actual business address, (2) his outside business activities, (3) that he had tax liens against him, and (4) that he had a felony criminal conviction. (Compl. ¶ 41.) The SEC informed Mr. Carlson of these deficiencies in a letter dated 6 June 2019. (Compl. ¶ 41.)

60. A few months later, in or about October 2019, the SEC confirmed that Mr. Carlson had an undisclosed felony charge, a felony nolo contendere plea, and two tax liens. (Compl. ¶ 42.) On 17 December 1985, Mr. Carlson had been arrested and charged with felony possession of a controlled substance, to which he pled nolo contendere. (Compl. ¶ 27.) This had never previously been disclosed to the SEC. (Compl. ¶¶ 27–28.)

61. Mr. Carlson did not make any attempts to update his registration until 23 June 2020. (Compl. ¶ 43.) However, throughout this time he did not inform Ms. Pridgen that any of this was occurring. Rather, Mr. Carlson continued to represent to Ms. Pridgen that his RIA services were offered through IWAI and that his

registration was current. (Compl. ¶¶ 43, 48.) Specifically, from 1 May 2019 through 15 December 2020, Carlson Financial held itself out as "Investment Advisory Services Offered through Institute for Wealth Management, Inc[.]" (Compl. ¶ 48.)

### E. Securities Division of North Carolina Investigation

62. On the same day as Mr. Carlson's attempts to update his registration, a securities Form U4 was filed with the Securities Division reporting a number of Mr. Carlson's unreported disclosure deficiencies. (Compl. ¶ 212.) Almost a year later, on 14 March 2021, the Institute filed a securities Form U5 terminating Mr. Carlson's active advisor registration with it. A Form U5 is understood in the industry to mean that the individual was encouraged to leave rather than fired. (Compl. ¶ 213.)

63. Based on Mr. Carlson's failure to update his registration in a timely manner or inform his clients of his lack of registration, the Securities Division sent a cease-and-desist letter to Mr. Carlson on 26 March 2021 stating in pertinent part:

> CARLSON failed to comply with the registration provisions of the Act by transacting business as an unregistered investment adviser representative in the State from on or about May 1, 2019 through on or about July 31, 2020. CARLSON unlawfully generated in excess of $450,000 in advisory management fees in North Carolina while unregistered from on or about May 1, 2019 through on or about July 31, 2020.

(Compl. ¶ 46.)

64. The Securities Division entered an order prohibiting Mr. Carlson and Carlson Financial from: (1) promoting themselves or operating in any way as an unregistered investment advisor or (advisor representative); and (2) violating any

provision of the Investment Advisers Act or in willful violation of Chapter 78C of the North Carolina Investment Advisers Act or any rule thereunder. (Compl. ¶ 215.)

65. Despite this order, Mr. Carlson continued to operate as an unregistered investment advisor. (Compl. ¶ 216.) A second order against Mr. Carlson was entered on 21 May 2021, in which Mr. Carlson was directed to "[i]mmediately and permanently cease and desist from violating [N.C.G.S.] §§ 78C-16(a1), 78C-18(d), 78C-19(a)(2)(b), and 18 NCAC 06A. 1703." (Compl. ¶¶ 217–18.) Even after this order, Mr. Carlson continued to operate out of Carlson Financial as an unlicensed investment advisor. (Compl. ¶ 219.) None of this was disclosed to Ms. Pridgen. (Compl. ¶¶ 217–19.)

66. Due to his lack of registration as an investment advisor for this period, Mr. Carlson began appending the name of Nathaniel Barton (Mr. Barton), a planning assistant at Carlson Financial, to account statements going out to clients, including Ms. Pridgen. (Compl. ¶ 206.) However, Mr. Carlson and Carlson Financial continued to charge Ms. Pridgen as if Mr. Carlson was a duly registered investment advisor through at least 2022. (Compl. ¶ 210.)

67. On 19 April 2021, Ms. Pridgen received a phone call from Mr. Barton in which he informed her that Mr. Carlson had lost his financial advisor's license. (Pl.'s Opp'n Mot. Dismiss [Pl.'s Opp'n], Aff. Tami L. Pridgen ¶¶ 5, 7, ECF No. 24.1 [Pridgen Aff.].) Further, Mr. Barton shared the online link that contained the findings of the Secretary of State. Mr. Barton did not share any further details. (Pridgen Aff. ¶¶ 7–

8.)  After the phone call, Ms. Pridgen followed up with Mr. Carlson, who responded that the information Mr. Barton provided was not true.  (Pridgen Aff. ¶ 9.)

68.    However, shortly thereafter, Ms. Pridgen decided to make a change of advisors and began looking for an attorney.  (Pridgen Aff. ¶ 10; Compl. ¶ 26.)  Ms. Pridgen terminated the relationship with Mr. Carlson around July 2021.  (Compl. ¶ 26.)

### III.    PROCEDURAL BACKGROUND

69.    On 17 April 2024, Ms. Pridgen initiated this action upon the filing of the Complaint.  (ECF No. 2.)

70.    The Carlson Defendants filed their Motion on 4 October 2024.  (ECF No. 9.) On 25 February 2025, Repple filed its Motion.  (ECF No. 12.)

71.    After full briefing, the Court held a hearing on the Motions on 9 June 2025 (the Hearing), where all parties were represented by counsel.  (*See* ECF No. 39.)

72.    The Motions have been fully briefed.  The Motion is now ripe for resolution.

### IV.    LEGAL STANDARD

#### A.    Rule 12(b)(6)

73.    In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations in the complaint in the light most favorable to the plaintiff. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017).  The Court's inquiry is "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]"  *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987).  The Court

accepts all well-pleaded factual allegations in the relevant pleading as true. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018). The Court is therefore not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. HHS, Div. of Facility Servs.*, 174 N.C. App. 266, 274 (2005) (citation omitted).

74. Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (citation omitted). The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Id.* (citation omitted). Moreover, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001) (citation omitted).

75. Our Supreme Court has observed that "[i]t is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cnty.*, 355 N.C. 161, 166 (2002)). This standard of review for Rule 12(b)(6) motions is the standard our

Supreme Court "routinely uses . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at 615 n.7 (citations omitted).

### B.      Rule 12(b)(1)

76.      A court shall dismiss the action when it appears that the court lacks subject matter jurisdiction. N.C. R. Civ. P. 12(h)(3). A defect in subject matter jurisdiction may be raised by a party or by the court *sua sponte*. *Conner Bros. Mach. Co. v. Roger*s, 177 N.C. App. 560, 561 (2006). "A motion to dismiss for lack of subject matter jurisdiction is not viewed in the same manner as a motion to dismiss for failure to state a claim upon which relief can be granted." *Tart v. Walker*, 38 N.C. App. 500, 502 (1978). A court may consider matters outside the pleadings in determining whether subject matter jurisdiction exists. *Id.*; *Keith v. Wallerich*, 201 N.C. App. 550, 554 (2009).

## V.      ANALYSIS

### A.      Limitations Period for Ms. Pridgen's Claims

77.      The Court begins by examining the applicability of the statutes of limitations and repose in N.C.G.S. 1-15(c) and N.C.G.S. 1-52(16) to Ms. Pridgen's claims.

78.      "A statute of limitations can provide the basis for dismissal on a Rule 12(b)(6) motion if the face of the complaint establishes that plaintiff's claim is so barred." *Soderlund v. N.C. Sch. of the Arts*, 125 N.C. App. 386, 389 (1997) (citation omitted). "Dismissal pursuant to Rule 12(b)(6) on the grounds that a claim is barred by the statute of limitations is proper only when all the facts necessary to establish

that the claim is time-barred are either alleged or admitted in the complaint, construing the complaint liberally in favor of plaintiff." *Lau v. Constable*, 2017 NCBC LEXIS 10, at *10 (N.C. Super. Ct. Feb. 7, 2017) (cleaned up) (citing *Fox v. Sara Lee Corp.*, 210 N.C. App. 706, 708–09 (2011)).

79.     "Once a statute of limitations issue is properly raised by a defendant, 'the burden of showing that the action was instituted within the prescribed period is on the plaintiff.' " *Beam v. Sunset Fin. Servs., Inc.*, 2019 NCBC LEXIS 56, at *32 (N.C. Super. Ct. Sep. 3, 2019) (quoting *Horton v. Carolina Medicorp*, 344 N.C. 133, 136 (1996) (citation omitted)).  "A plaintiff sustains this burden by showing that the relevant statute of limitations has not expired." *Id.* (citation omitted).

80.     The Carlson Defendants and Repple argue that the fraud claims should be analyzed under the statute of limitations provided in N.C.G.S. § 1-15(c) because investment advisory services are considered professional services, and the fraud claims are in essence claims of professional malpractice.  (Memo. Supp. Roy Neil Carlson & Carlson Financial Services, LLC's Mot. Dismiss 6, ECF No. 19 [Carlson Memo.]; Def. G.A. Repple & Company's Br. Supp. Mot. Dismiss Pl.'s Compl. 7–8, ECF No. 20 [Repple Br.].)

81.     Ms. Pridgen responds that the claims alleged are not claims of professional malpractice and Defendants are not considered professionals under N.C.G.S. § 1-15(c).  (Pl.'s Opp'n 21–23, ECF No. 24.)

82.     N.C.G.S. § 1-15(c) imposes the following statute of limitations:

(c) Except where otherwise provided by statute, a cause of action for malpractice arising out of the performance of or failure to perform

professional services shall be deemed to accrue at the time of the occurrence of the last act of the defendant giving rise to the cause of action[.]

N.C.G.S. § 1-15(c).

83. The Court first notes that the parties have not cited any case, and the Court has found none, in which this statute has been applied to investment advisors.

84. This Court has stated that there is no "authority to support the legal proposition that a professional negligence claim exists in North Carolina for the negligent acts of investment advisors." *Burton v. Hobart Fin. Grp., Inc.*, 2024 NCBC LEXIS 34, at *51 (N.C. Super. Ct. Feb. 26, 2024). Further, the Supreme Court of North Carolina has determined that under N.C.G.S. § 1-15(c), the term professional services refers to "those services where a professional relationship exists between plaintiff and defendant—such as a physician-patient or attorney-client relationship." *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 665 (1997) (quoting *Doe v. Am. Nat'l Red Cross*, 798 F. Supp. 301, 306 (E.D.N.C. 1992) (footnote omitted)). The Court is not inclined to expand the scope of professional services under section 1-15(c) to include investment advisors in the absence of persuasive authority.

85. Moreover, even if this Court were to find that this statute applies to claims of professional negligence arising from investment advisory services, it would not apply to Ms. Pridgen's fraud claims. *See Provectus Biopharmaceuticals, Inc. v. RSM US LLP*, 2018 NCBC LEXIS 101, at *29 (N.C. Super. Ct. Sep. 28, 2018) ("Fraud by a professional is not within the scope of section 1-15(c)."). Fraud claims are governed by N.C.G.S. § 1-52(9). *Id.*

86. Defendants contend that even though Ms. Pridgen has alleged claims for fraud, those claims are "in essence" claims for professional malpractice. The Court does not agree. Defendants rely on *Fender v. Deaton*, in which the North Carolina Court of Appeals determined that fraud claims were "in essence claims of legal malpractice" when plaintiff alleged the defendant failed to accept or return calls, failed to discuss the cause of action with plaintiff, and dismissed the case without knowledge or consent of plaintiff. 153 N.C. App. 187, 190–91 (2002).

87. The claims in *Fender* are not analogous to the case at bar. Here, Ms. Pridgen's fraud claims revolve around breaches of fiduciary duty from representations made by Defendants regarding her investments. These are not claims for mere malpractice by failing to perform their investment duties. Thus, the fraud claims will be analyzed as fraud claims, and N.C.G.S. § 1-15(c) is not applicable in this case.

88. In the alternative, Defendants raised an unbriefed argument at the Hearing that the statute of repose in N.C.G.S. § 1-52(16) applies. Because Defendants did not properly brief this issue, the Court will not consider it.

89. The Court now turns to Defendants' substantive arguments and will analyze each claim in turn.

**B.   Counts One, Two, Three, and Four: Fraud**

90. Ms. Pridgen has asserted four claims for fraud—Count One against all Defendants for fraudulent inducement, (Compl. ¶¶ 239–54), Count Two against all Defendants for fraudulent concealment, (Compl. ¶¶ 255–75), Count Three against all

Defendants for constructive fraud, (Compl. ¶¶ 276–91) and Count Four against all Defendants for common law fraud, (Compl. ¶¶ 292–310).

91. Defendants argue that Ms. Pridgen's fraud claims are barred by the statute of limitations because Ms. Pridgen had ample reason to investigate Mr. Carlson's actions as early as 2009. (Repple Br. 15.) Even in the light most favorable to Ms. Pridgen, Defendants contend that Ms. Pridgen's claims accrued no later than May 2015 or April 2016. (Carlson Memo. 9; Repple Br. 15.)

92. In the alternative, the Carlson Defendants contend that even if the fraud claims are not time barred, the claims are not pled with sufficient particularity as required under Rule 9(b). (Carlson Memo. 10–12.) Further, Repple contends that all of Ms. Pridgen's allegations against it are based on its association with Mr. Carlson, a relationship which ended in 2013. (Repple Br. 8.)

93. Repple contends that it cannot be vicariously liable under the doctrine of *respondeat superior* as all the alleged fraudulent statements were made by Mr. Carlson and not Repple except for the 17 November 2009 letter sent by Mr. Repple. Repple argues that Ms. Pridgen is trying to impute liability on it based on representations made by Mr. Carlson. (Repple Br. 9–10, 9 n.2.)

94. "Under the doctrine of *respondeat superior*, a principal is liable for the torts of its agent which are committed within the scope of the agent's authority, when the principal retains the right to control and direct the manner in which the agent works. Of course, *respondeat superior* does not apply unless an agency relationship . . .

exists." *Sutton v. Driver*, 211 N.C. App. 92, 107 (2011) (quoting *Holleman v. Aiken*, 193 N.C. App. 484, 504 (2008)).

95.     The Court of Appeals has stated that "intentional tortious acts are rarely considered to be within the scope of an employee's employment." *B.B. Walker Co. v. Burns Int'l Sec. Servs., Inc.*, 108 N.C. App. 562, 566 (1993).  However, "a principal is liable 'to third parties for the fraud [committed by] its agent while acting within' the scope of his or her authority." *BDM Invs. v. Lenhil, Inc.*, 2014 NCBC LEXIS 6, at *53 (N.C. Super. Ct. Mar. 20, 2014) (quoting *White v. Consol. Plan., Inc.*, 166 N.C. App. 283, 297 (2004)).  "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." *White*, 166 N.C. App. at 298 (citations omitted).  Thus, it is irrelevant "that the servant or other agent acts entirely for his own purposes, unless the [victim] had notice of this." *Id.* (citations omitted).

96.     Here, Mr. Carlson's alleged fraudulent statements relate to Ms. Pridgen's investment portfolio during the scope of her relationship with Mr. Carlson as her investment advisor.  Mr. Carlson was authorized to send out monthly statements to Ms. Pridgen and to discuss the financial status of her investments.  Further, there is no indication that Ms. Pridgen would have known that Mr. Carlson was not acting within his authority given by Repple as he explained that Repple "would be acting as an auditor or supervisor of [his] work."  (Compl. ¶ 11.)  Thus, Mr. Carlson was performing the specific duties he was hired to accomplish, and therefore, at this

preliminary stage, Ms. Pridgen has alleged enough to show Repple can be held liable for Mr. Carlson's actions as its agent.[2]

### 1. Counts One and Four: Fraudulent Inducement and Common Law Fraud

97. As a preliminary matter, Defendants argue that the statute of limitations and repose bar Ms. Pridgen's fraud claims. As analyzed above, the statute of limitations and repose in N.C.G.S. § 1-15(c) is not applicable in this case. Thus, the general statute of limitations for fraud is applicable.

98. The statute of limitations for fraud claims is three years. N.C.G.S. § 1-52(9). Typically, the statute of limitations begins to run at the time that the injury occurs. *Matthieu v. Piedmont Nat. Gas Co.*, 269 N.C. 212, 215 (1967). However, fraud claims are subject to the discovery rule. *See* N.C.G.S. § 1-52(9) (Fraud claims do not accrue "until the discovery by the aggrieved party of the facts constituting the fraud or mistake.").

99. The discovery rule "tolls the statute of limitations only until a reasonable person should have discovered the fraud under the circumstances and in the exercise of reasonable prudence. The particular moment that a specific plaintiff alleges he *actually* discovered the fraud is irrelevant." *Taylor v. Bank of Am., N.A.*, 385 N.C. 783, 789 (2024) (citing *Latham v. Latham*, 184 N.C. 55, 66 (1922)).

---

[2] Mr. Carlson's association with Repple ran from 1 November 2007 until 21 June 2013. (Compl. ¶ 36.) Thus, Repple can only be held liable for Mr. Carlson's actions under the doctrine of *respondeat superior* until Ms. Pridgen was advised that the agency relationship was terminated. *See Sutton*, 211 N.C. App. at 107 ("*respondeat superior* does not apply unless an agency relationship . . . exists") (citations omitted).

100. Discovery, with respect to fraud, is defined as "actual discovery or the time when the fraud should have been discovered in the exercise of due diligence." *Spears v. Moore*, 145 N.C. App. 706, 708 (2001). Accrual begins "at the time of discovery regardless of the length of time between the fraudulent act or mistake and plaintiff's discovery of it." *Forbis v. Neal*, 361 N.C. 519, 524 (2007) (quoting *Feibus & Co. v. Godley Constr. Co.*, 301 N.C. 294, 304 (1980) (emphasis omitted)). However, " 'the failure of the defrauded person to use diligence in discovering the fraud may be excused where there exists a relation of trust and confidence between the parties.' " *Vail v. Vail*, 233 N.C. 109, 116 (1951).

101. "Absent undisputed circumstances that, as a matter of law, would have alerted a reasonable person to investigate, determining when a plaintiff discovered or should have discovered facts constituting a claim is generally an issue of fact reserved for a jury." *Hart v. First Oak Wealth Mgmt., LLC*, 2025 NCBC LEXIS 27, at *61–62 (N.C. Super. Ct. Mar. 14, 2025) (collecting cases). However, "[a] statute of limitation or repose may be the basis of a 12(b)(6) dismissal if on its face the complaint reveals the claim is barred." *Forsyth Mem'l Hosp. v. Armstrong World Indus.*, 336 N.C. 438, 442 (1994) (citation omitted).

102. Defendants contend that no later than 2016, Ms. Pridgen was armed with sufficient information to discover the misrepresentations at issue. Defendants direct the Court's attention to the 17 November 2009 letter regarding DBSI's bankruptcy, (Compl. ¶ 116), the 21 May 2012 letter from Lifepoint Community Church regarding its bankruptcy, (Compl. ¶ 155), and the published statements made in 2014 and 2016

by CNL Lifestyle regarding its unreliable financial information, (Compl. ¶ 141). (*See also* Carlson Memo. 8–9; Repple Br. 15.)

103. First, Ms. Pridgen alleges that she was not informed of the statements made by CNL Lifestyle or the bankruptcy of Lifepoint Community Church as that information was only disclosed to Mr. Carlson. (Compl. ¶¶ 141, 155.) Second, Ms. Pridgen asserts that she did inquire about her investments—specifically when DBSI went bankrupt, and that she was reassured that everything was fine and that these events would increase the value of her investments. (Compl. ¶¶ 124, 135, 138, 143.) Moreover, the alleged inflated rates on her statements led Ms. Pridgen to believe what Mr. Carlson was saying. (Compl. ¶¶ 49, 76, 95, 166, 168, 267.) Ms. Pridgen alleges that the earliest time she should have been alerted to investigate was April 2021, when Mr. Barton informed her of Mr. Carlson's lack of a financial advisor's license. (Pridgen Aff. ¶¶ 5–7.)

104. Reading the allegations in the light most favorable to Ms. Pridgen and based upon the discovery rule, the Court determines that, at this preliminary stage, Ms. Pridgen has met her burden of showing that the fraud claims are not barred as a matter of law by the applicable statute of limitations. *See, e.g., Hart v. First Oak Wealth Mgmt., LLC*, 2022 NCBC LEXIS 81, at *42 (N.C. Super. Ct. July 28, 2022) (finding at the motion to dismiss stage plaintiff's allegations of defendants' concealment was sufficient to rebut the statute of limitations argument); *Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 116, at *52–53 (N.C. Super Ct. Dec. 31, 2019) (concluding on a motion to dismiss that given the disputed facts about when plaintiffs

could have discovered the Ponzi schemes at issue, "[p]laintiffs' fraud-based claims are [not] time-barred").

105. Turning to the substantive allegations of Ms. Pridgen's fraud claims, Ms. Pridgen alleges that Mr. Carlson made affirmative false representations during the October 2007 meetings, including that he would act in Ms. Pridgen's best interests and that he and Carlson Financial would maintain their RIA registration. (Compl. ¶¶ 249, 251.) These statements induced Ms. Pridgen to engage Mr. Carlson as her investment advisor. (Compl. ¶ 190.) Further, Ms. Pridgen alleges Repple was vicariously liable for these representations as Mr. Carlson was acting within the scope of his agency relationship with Repple at the time of the alleged misrepresentations. (Compl. ¶ 246.)

106. The essential elements of fraudulent inducement are: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 609 (2008).

107. Rule 9(b) requires that "the circumstances constituting fraud" be alleged "with particularity." N.C. R. Civ. P. 9(b). Our Supreme Court has held that "in pleading actual fraud[,] the particularity requirement is met by alleging [the] time, place[,] and content of the fraudulent representation, [the] identity of the person making the representation[,] and what was obtained as a result of the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85 (1981).

108. The Carlson Defendants concede that the statements made in 2007, 2009, 2012, 2015, and 2018 were pled with sufficient particularity. (Carlson Memo. 10.) They merely argue that the statute of limitations bars these claims. However, as stated above, at this stage of the proceeding, Ms. Pridgen has sufficiently alleged that her claims are not barred by the statute of limitations.

109. The fraudulent inducement claims are based on the representations made by Mr. Carlson to Ms. Pridgen during the initial October 2007 meetings. The Carlson Defendants concede that these allegations were alleged with sufficient particularity. Thus, the Carlson Defendants' Motion on this claim is **DENIED**.

110. Moreover, as to Repple, Ms. Pridgen alleges that Mr. Carlson was acting within the scope of his agency at the time of the October 2007 representations. There are no facts alleged in the Complaint which would demonstrate that Ms. Pridgen was aware that Mr. Carlson was not acting within the scope of his authority at the relevant time. Therefore, at this preliminary stage, Ms. Pridgen has met her burden to demonstrate vicarious liability, and the Repple Motion is **DENIED** on this claim.

### 2. Count Two: Fraudulent Concealment

110. A claim for fraudulent concealment is governed by the same three-year statute of limitations as a fraudulent inducement claim, and the discovery rule applies. *See* N.C.G.S. § 1-52(9); *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 2015 NCBC LEXIS 64, at *18 (N.C. Super. Ct. June 19, 2015). Thus, as analyzed above,

at this preliminary stage, Ms. Pridgen has sufficiently alleged that the fraud claims are not barred by the applicable statute of limitations.

111. To state a claim for fraudulent concealment, the plaintiff must plead the same elements: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Terry*, 302 N.C. at 83 (citations and quotations omitted). In addition, for fraudulent concealment, a plaintiff must allege that defendant "had a duty to disclose material information [to the plaintiff], as silence is fraudulent only when there is a duty to speak." *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 20, at *8 (N.C. Super. Ct. June 18, 2007).

112. This Court has acknowledged that fraudulent concealment "is, by its very nature, difficult to plead with particularity." *Id.* at *9 (quoting *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195 (M.D.N.C. 1997) (internal quotation marks omitted)). Notwithstanding that difficulty, to meet the 9(b) particularity requirements, the plaintiff must also allege the following:

> (1) the relationship [between plaintiff and defendant] giving rise to the duty to speak; (2) the event or events triggering the duty to speak and/or the general time period over which the relationship arose and the fraudulent conduct occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what [the defendant] gained by withholding information; (6) why plaintiff's reliance on the omission was both reasonable and detrimental; and (7) the damages proximately flowing from such reliance.

*Lawrence,* 2007 NCBC LEXIS 20, at *9–10 (quoting *Breeden*, 171 F.R.D. at 195–96).

113. The allegations against the Carlson Defendants have been pled with sufficient particularity at this stage of the proceeding. Ms. Pridgen has sufficiently pled a fiduciary relationship between herself and both Mr. Carlson and Carlson Financial that gave rise to a duty to speak. *See infra* ¶¶ 122–25; *see also McKee v. James*, 2013 NCBC LEXIS 33, at *23 (N.C. Super. Ct. July 24, 2013) (a duty to speak arises "in the context of a fiduciary relationship"). This relationship, if proven, would give rise to a duty to disclose the material facts Mr. Carlson was aware of, including the true value and status of Ms. Pridgen's investments.

114. Ms. Pridgen alleges that Mr. Carlson failed to inform her of his felony charge (Compl. ¶ 27), as well as the true value and status of her investments (specifically those involving entities that had undergone bankruptcy proceedings) (Compl. ¶¶ 76, 81, 110, 118, 136, 150), and when her investments were in financial distress, (Compl. ¶¶ 136, 141, 152). Ms. Pridgen alleges that when she would ask questions, Mr. Carlson's answers would make her believe that "she was just not capable of understanding that everything was just fine." (Compl. ¶ 144.) Despite a fiduciary relationship, she contends, Mr. Carlson and Carlson Financial failed to disclose these material facts to her. (Compl. ¶¶ 27, 136, 152, 155, 211.) Ms. Pridgen further alleges that Mr. Carlson and Carlson Financial profited from these inflated rates and faulty investments. (Compl. ¶¶ 81, 133, 166, 303.)

115. Moreover, Ms. Pridgen asserts that she was completely reliant on Mr. Carlson for investment advice as he explained that at all times he would act as her

fiduciary. (Compl. ¶¶ 23–24, 85.) Indeed, Ms. Pridgen alleges that Mr. Carlson and Carlson Financial "assumed total discretionary control over [Ms.] Pridgen's investment portfolio." (Compl. ¶ 53.) Based on these, and other similar allegations, the Court concludes that Ms. Pridgen has sufficiently stated a claim for fraudulent concealment against Mr. Carlson and Carlson Financial.

116. Repple argues that the claims against it are based on its supervisory role over Mr. Carlson and that the allegations do not, by themselves, assert a direct claim against it. (Repple Br. 9–10.) However, as stated above, Ms. Pridgen alleges that "[Mr.] Carlson and Carlson Financial were, at relevant times, agents of Repple (*i.e.*, investment adviser representatives), operating within the course and scope of that agency." (Compl. ¶ 232.) The Complaint alleges that Mr. Carlson sent monthly account statements, through Repple, that contained false financial information. (Compl. ¶¶ 98–99, 104, 303.) Thus, at this stage of the litigation, Ms. Pridgen has satisfied the pleading requirements for a claim against Repple. *See, e.g., Thrower v. Coble Dairy Prods. Co-operative, Inc.*, 249 N.C. 109, 112 ("The master is liable for the unlawful or negligent acts of his servant if about the master's business, and if doing or attempting to do that which he was employed to do.").

117. Thus, the Carlson Defendants' Motion is **DENIED,** and Repple's Motion is also **DENIED** to the extent the fraudulent concealment claim is based on concealments during Repple and Mr. Carlson's relationship.

### 3. Count Three: Constructive Fraud

118. "A claim of constructive fraud based upon a breach of fiduciary duty falls under the ten-year statute of limitations contained in N.C.[G.S.] § 1-56[.]" *NationsBank v. Parker*, 140 N.C. App. 106, 113 (2000). Further, the statute of limitations accrues upon discovery. *See Carlisle v. Keith*, 169 N.C. App. 674, 685 (2005). Thus, based on the discovery rule, at this stage of the proceeding, Ms. Pridgen has met her burden of showing initially that her claims are timely.

119. To establish a constructive fraud claim, a plaintiff must allege: "(1) facts and circumstances creating a relation of trust and confidence; (2) which surrounded the consummation of the transaction in which the defendant is alleged to have taken advantage of the relationship; and (3) the defendant sought to benefit himself in the transaction." *Self v. Yelton*, 201 N.C. App. 653, 660 (2010) (citation and quotation marks omitted).

120. First and foremost, "[a] claim for constructive fraud requires the presence of a confidential or fiduciary relationship between the parties." *DS & T II, Inc. v. D & E Tax & Acct., Inc.*, 2021 NCBC LEXIS 87, at *18 (N.C. Super. Ct. Oct. 4, 2021) (citing *Forbis*, 361 N.C. at 528). "Absent such a relationship, Plaintiffs' claim necessarily fails." *Id.* (citing *Loray Master Tenant, LLC v. Foss N.C. Mill Credit 2014 Fund I, LLC*, 2021 NCBC LEXIS 15, at *14 (N.C. Super. Ct. Feb. 18, 2021) ("A claim for constructive fraud . . . requires a plaintiff to allege facts establishing a confidential or fiduciary relationship.").

121. Ms. Pridgen has sufficiently alleged that, as an investment advisor, Mr. Carlson "is a fiduciary and has a duty to act primarily for the benefit of [his] clients." 18 N.C. Admin. Code 06A.1801(a).

122. Further, "North Carolina courts have found that the relationship between an unsophisticated investor and a financial advisor can be a [*de facto*] fiduciary one depending on the circumstances." *Howell v. Heafner*, 2020 NCBC LEXIS 105, at *35 (N.C. Super. Ct. Sep. 11, 2020) (citing *Beam*, 2019 NCBC LEXIS 56, at *11 (finding a *de facto* fiduciary relationship where plaintiffs were an elderly couple who lacked financial sophistication); *see also Hart*, 2022 NCBC LEXIS 81, at *31 (finding a *de facto* fiduciary relationship when plaintiff lacked expertise in the financial field, the investment advisors had discretionary authority, and defendants represented they were plaintiff's fiduciaries); *Austin v. Regal Inv. Advisors, LLC*, 2018 NCBC LEXIS 3, at *19 (N.C. Super. Ct. Jan. 8, 2018) (a *de facto* fiduciary relationship existed when plaintiffs were unsophisticated investors who relied on advisor's expertise and gave advisor discretionary authority).

123. Ms. Pridgen alleges that Mr. Carlson was a registered investment advisor, at least until the discrepancies were found on his renewal application. (Compl. ¶¶ 8–9, 41.) Carlson Financial was also represented to be a registered investment advisor during that time. (Compl. ¶ 9.) Consequently, pursuant to 18 N.C. Admin. Code 06A.1801(a), they are fiduciaries *de jure*.

124. Furthermore, to the extent Mr. Carlson and Carlson Financial were not registered investment advisors during their relationship with Ms. Pridgen, Ms.

Pridgen alleges sufficient facts to support the allegation that there was a *de facto* fiduciary relationship. Ms. Pridgen asserts that at the time her relationship with Mr. Carlson was formed and until she discovered his wrongdoing, she had no expertise in investing and her husband made the primary financial decisions for her family. (Compl. ¶¶ 2–3.) Due to her lack of financial expertise, Ms. Pridgen gave Mr. Carlson and Carlson Financial complete discretionary control over her investment portfolio. (Compl. ¶¶ 53–54.) Moreover, Mr. Carlson represented that he and Carlson Financial would be operating at all times as Ms. Pridgen's fiduciaries and look after her best interests. (Compl. ¶ 12.)

125. As for Repple, at least from 2007 through June 2013, Ms. Pridgen alleges that Repple was acting as an auditor or supervisor of Mr. Carlson and Carlson Financial. (Compl. ¶ 11.) Further, Mr. Carlson and Carlson Financial operated as Ms. Pridgen's registered investment advisors pursuant to registration maintained by Repple. (Compl. ¶ 12.) Thus, at least until June 2013, Ms. Pridgen has sufficiently alleged that Repple was her fiduciary. Ms. Pridgen has also alleged that, in breach of their fiduciary duties, Defendants artificially inflated the value of her investments to increase their percentage-based advisory and management fees and that, as a result, Defendants received compensation in the form of fees to which they were not entitled. (Compl. ¶¶ 76, 95, 148, 284.)

126. Once a fiduciary relationship is established, "[a] claim of constructive fraud does not require the same rigorous adherence to elements as actual fraud." *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 482 (2004) (quoting *Terry*, 302

N.C. at 83 (quotation marks omitted)). "Constructive fraud differs from actual fraud in that it is based on a confidential relationship rather than a specific misrepresentation." *Id.* (citing *Barger*, 346 N.C. at 666 (quotation marks omitted)). Accordingly, a claim for constructive fraud "does not need to meet the Rule 9(b) pleading requirement." *Beam*, 2019 NCBC LEXIS 56, at *12 (quoting *Hunter*, 162 N.C. App. at 482).

127.    Thus, the Court concludes that Ms. Pridgen has sufficiently alleged a claim for constructive fraud against all Defendants. Specifically, to the extent Defendants argue Ms. Pridgen's claim for constructive fraud should be dismissed for failing to plead with particularity, Defendants' argument is misplaced, and the Motions should be **DENIED**.

### C.    Violation of the North Carolina Investment Advisers Act

128.    The North Carolina Investment Advisers Act's (the NCIAA) applicable statute of limitations provision states:

> No person may sue . . . more than three years after the person discovers facts constituting the violation, but in any case no later than five years after the rendering of investment advice, except that if a person who may be liable under this section engages in any fraudulent or deceitful act that conceals the violation . . . the suit may be commenced not later than three years after the person discovers or should have discovered that the act was fraudulent or deceitful.

N.C.G.S. § 78C-38(d).

129.    Here, allegations of wrongful conduct date back to 2007 when Ms. Pridgen engaged Mr. Carlson as her investment advisor. The Complaint was filed on 17 April 2024, well past the five-year limit. However, evaluating the Complaint in the light

most favorable to Ms. Pridgen, fraudulent inducement and fraudulent concealment are sufficiently alleged, and there are disputed facts regarding when Ms. Pridgen should have reasonably discovered the fraudulent conduct. *See, e.g., Hart*, 2022 NCBC LEXIS 81, at *53 (declining to dismiss NCIAA violations on statute of limitations grounds at the motion to dismiss stage).

130. Defendants do not argue for dismissal of this claim on any other grounds except the statute of limitations. Thus, the Motions are **DENIED** as to this claim.

### D. Negligent Misrepresentation

131. The statute of limitations for negligent misrepresentation is three years. N.C.G.S. § 1-52(5). However, "[a] claim for negligent misrepresentation does not accrue until two events occur: first, the claimant suffers harm because of the misrepresentation, and second, the claimant discovers the misrepresentation." *Trantham v. Michael L. Martin, Inc.*, 228 N.C. App. 118, 126 (2013) (quotation marks omitted). Thus, as stated above, whether the statute of limitations bars Ms. Pridgen's negligent misrepresentation claim will be determined on a more developed record.

132. As the Defendants do not provide any other argument for dismissal of the negligent misrepresentation claim, the Motions are **DENIED** as to this claim.

### E. Civil Liability under N.C.G.S. § 1-538.2

133. N.C.G.S. § 1-538.2 allows for private actions for claims predicated on a violation of the criminal statutes for larceny, embezzlement, or a related criminal offense. *See Caliber Packaging & Equip., LLC v. Swaringen*, 2023 NCBC LEXIS 74, at *8 (N.C. Super. Ct. May 31, 2023). Specifically, the statute states "[a]ny person . .

. who commits an act that is punishable under G.S. 14-72, 14-72.1, 14-72.11, 14-74, 14-86.6, 14-86.7, 14-90, or 14-100 is liable for civil damages to the owner of the property." N.C.G.S. § 1-538.2.

134. As there is no statute of limitations provided in N.C.G.S. § 1-538.2, the statute of limitations in N.C.G.S. § 1-52(2) applies. *See* N.C.G.S. § 1-52(2) ("Within three years an action . . . [u]pon liability created by statute, either state or federal, unless some other time is mentioned in the statute creating it."). Further, the Court is aware of no cases which would support applying the discovery rule to this claim.

135. Thus, any allegation of actions occurring or performed under N.C.G.S. § 1-538.2 that took place before 17 April 2021 are barred by the three-year statute of limitations applicable to a claim under section 1-538.2. Therefore, the Repple Motion is **GRANTED** in its entirety as to this claim, and the Carlson Motion is **GRANTED** to the extent the claim is based on actions that occurred prior to 17 April 2021.

## VI.     CONCLUSION

136. For the foregoing reasons, the Court hereby **GRANTS** in part and **DENIES** in part the Motions as follows:

a. The Motions are **GRANTED** as to Count Seven for civil liability pursuant to N.C.G.S. § 1-538.2, to the extent said claim is based on actions that occurred prior to 17 April 2021.

b. Except as herein granted, the Motions are **DENIED**.

**SO ORDERED**, this the 25th day of July, 2025.

/s/ Michael L. Robinson
Michael L. Robinson
Chief Business Court Judge